IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

| | |
|---|---|
| JOSE FLORES, ) | |
| ) | |
| Plaintiff, ) | |
| ) | 10 CV 8040 |
| v. ) | |
| ) | Hon. Sarah L. Ellis |
| SHERIFF OF COOK COUNTY, et al. ) | |
| ) | |
| Defendants. ) | |

**DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR
MOTION FOR SUMMARY JUDGMENT**

Defendants COOK COUNTY SHERIFF THOMAS DART ("Sheriff") and COOK COUNTY ("County") and (collectively "Defendants"), by and through their attorneys, ANITA ALVAREZ, State's Attorney of Cook County, and R. Seth Shippee, Assistant State's Attorney, pursuant to FRCP Rule 56, submit the following memorandum of law in support of their motion for summary judgment on all clams brought by plaintiff JOSE FLORES ("Plaintiff").

**INTRODUCTION**

Plaintiff, a former pre-trial detainee, brings this action pursuant to the 42 U.S.C. § 1983 ("Section 1983") against the Sheriff in his official capacity only stemming from allegations that, pursuant to an official policy, Plaintiff was handcuffed and shackled to his bed while in a hospital outside the Cook County Jail ("Jail") from January 13 to January 17, 2009 in violation of his Due Process rights under the Fourteenth Amendment. Plaintiff has also named the County as a defendant as the statutory indemnifier of the Sheriff. As explained below, the well-developed factual record in this case ("Record") demonstrates that Plaintiff has not produced sufficient evidence to create a genuine issue of material fact as whether the Sheriff's policy in question is unconstitutional. Thus, Defendants are entitled to summary judgment.

1

## STANDARD OF REVIEW

Under Rule 56(c), summary judgment is proper "if the pleadings, deposition, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Although a court must view all facts and reasonable inferences in favor of the nonmoving party (*Samuelson v. LaPorte Cnty. Sch. Corp.*, 526 F.3d 1046, 1051 (7th Cir. 2008)), those inferences must be both reasonable and supported by the record (*Singer v. Raemisch*, 593 F.3d 529, 533 (7th Cir. 2010)), and a court is also not required to draw "[i]nferences that are supported by only speculation or conjecture" (*Fischer v. Avanade, Inc.*, 519 F.3d 393, 401 (7th Cir. 2008)). Summary judgment must be entered against the non-moving party where that party "fails to make a sufficient showing to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322. A party who will bear the burden of proof on a particular issue at trial must affirmatively demonstrate with specific facts that there is a genuine issue of material fact that requires trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 n. 11 (1986).

## STATEMENT OF FACTS

Plaintiff was a pre-trial detainee at the Jail in January of 2009. (SOF, ¶8). Prior to entering the Jail, Plaintiff had been at large for approximately nine years despite two outstanding felony arrest warrants. (SOF, ¶¶ 10-14). From January 13th to 17th, 2009, Plaintiff was hospitalized at John H. Stroger, Jr. Hospital of Cook County ("Stroger Hospital"), during which time he was shackled by one ankle and handcuffed by one wrist to his hospital bed and was guarded at all times. (SOF, ¶¶ 15-23). Due to kidney issues, Plaintiff's ankles were swollen, and

he experienced pain from his shackle. (SOF, ¶ 31, 33). During his hospitalization, Plaintiff's restraints were removed for at least two medical procedures and probably taken off for other examinations. (SOF, ¶ 27-29). Plaintiff did not complain about his shackles to any nurses and only complained to one unknown female doctor about his shackles, but, unless the doctors were performing a test, his restraints were not taken off. (SOF, ¶ 30, 32). Plaintiff has no recollection of hearing a doctor order that his shackles be removed. (SOF, ¶ 36). Also, while hospitalized, Plaintiff was not permitted to leave his bed to use the bathroom, and was given a bedpan and a urine bottle when he needed to relieve himself. (SOF, ¶ 26). In sum, however, Plaintiff testified that he believes that he was subjected to inhuman treatment and punishment only because the shackle was tight on his ankle because it was swollen and caused him pain. (SOF, ¶34).

Under the Sheriff's official Policy, all detainees transported to medical facilities outside the Jail are considered "high risk" because they are often guarded by a single officer, have more contact with the public and medical personnel, and have easier access to potential weapons. (SOF, ¶ 42). Due to the increased risk, detainees hospitalized outside the Jail are restrained by one wrist and one ankle and not permitted to leave their beds unless authorized to do so, including when they need to urinate or defecate, for which they are given a bedpan unless medically authorized to use the bathroom. (SOF, ¶¶ 43-45, 49-50). The purpose of the Sheriff's Policy is to protect the safety of hospital personnel, the detainees, and citizens. (SOF, ¶ 41). Over the past fifteen years, more than fifteen escapes or escape attempts were made while detainees were being transported to or treated at outside medical facilities, including escape attempts by detainees who appeared physically incapable of escaping, escape attempts by detainees whose restraints were removed so they could use the bathroom, and escape attempts in which the detainees severely injured officers, medical staff, civilians, or themselves. (SOF, ¶ 55-

59). Nevertheless, the Sheriff's Policy specifically requires that detainees' healthcare needs are met humanely and that they not be restrained in a way that would interfere with medical procedures or tests, including being allowed to use the restroom if medically permitted, and that detainees' restraints be removed when ordered by a doctor. (SOF, ¶¶ 40, 46, 48, 50, 51). The humane-treatment focus of the Sheriff's Policy can also be seen in the fact that it tracks the language of Illinois' County Jail Act's prohibition against using handcuffs, shackles, or restraints of any kind on pregnant detainees while they are in labor, unlike the jail standards of 45 other states and the Federal Bureau of Prisons ("FBOP") which either do not prohibit them or expressly allow their use. (SOF, ¶ 62). In the interest of brevity and mindful of Local Rule 7.1, Defendants also incorporate their Local Rule 56.1(A)(3) Statement of Material Facts ("SOF") as part of this memorandum, and will discuss those facts as necessary herein.

## ARGUMENT

Plaintiff has sued the Sheriff in his official capacity only. (SOF, ¶ 4). Official capacity claims governmental employees are actually claims against the governmental entity for which they work. *Minix v. Canarecci*, 597 F.3d 824, 831 (7th Cir. 2010). A local governmental entity is liable for damages only if a constitutional deprivation occurred as a result of an official policy, custom, or practice. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978). An official policy or custom may be shown by (1) an express policy, (2) an unwritten, widespread practice that is so entrenched and well-known as to carry the force of policy, or (3) through the actions of an individual with final policy-making authority for the government entity. *Rice ex. Rel. Rice v. Corr'l Med. Svcs.*, 675 F.3d 650, 666 (7th Cir. 2012).

Here, Plaintiff has alleged that he was harmed by "official policies of the defendant Sheriff[.]" (Exhibit A, ¶ 11). Plaintiff makes no claims regarding any alleged practices, unwritten

4

and widespread or otherwise, of the Sheriff regarding the alleged "shackling" injuries at issue. Thus, Plaintiff's claims against the Sheriff assert that he was harmed by the Sheriff's express policy on shackling detainees while they are away from the Jail in off-site hospitals. The Sheriff's policy at issue is summarized in relevant part as follows:

### *The Sheriff's Official Policy*

The Sheriff maintains an official policy regarding the treatment of detainees who are transported to off-site hospitals. (SOF, ¶ 40). "Cook County Sheriff's External Operations, K-Nine, Transportation, ERT Policy 32, Related General Order 9.44, Hospital Policy and Procedure" and "Related G.O. 12.2" (collectively, "Policy") states that it is the Sheriff's policy to ensure that the healthcare needs of hospitalized detainees are met in a humane manner. (*Id*.). The Policy also directs officers to "protect the rights and privileges of the detainees mandated into [their] custody." (*Id*.). Every detainee who is transported or housed outside the Jail is designated as a "high risk" detainee and is kept under constant visual surveillance. (SOF, ¶¶ 41-42). The purpose of this Policy is to provide for the safety of hospital personnel, civilians, and detainees themselves. (SOF, ¶ 41). Detainees must be handcuffed by one wrist to the hospital bed, with a padlocked chain around the bed frame, leaving enough slack to allow the detainee to move his or her arm. (SOF, ¶ 44). The Policy also requires that one leg shackle be applied to the detainee's ankle that is opposite his or her handcuffed wrist. (SOF, ¶ 45). The leg shackle is then attached to the hospital bed and double locked. (*Id*.).

Detainees who are treated in off-site hospitals are not allowed to leave their beds unless authorized to do so. (SOF, ¶ 43). Anytime a detainee is "ambulated, transported or tested", the Policy requires that he or she be accompanied by two officers and remain restrained with either handcuffs, leg shackles, or other approved restraining device. (SOF, ¶ 47). However, the Policy

expressly requires that detainees be restrained "in such a manner that will not unduly interfere with medical procedures and/or tests." (SOF, ¶ 46). The Policy directs that a detainee's leg shackles be removed when medically necessary. (SOF, ¶ 51). Sheriff's officers who guard restrained, hospitalized to detainees must "use reasonable judgment" during life-threatening situations and not hinder treatment performed on detainees by medical personnel. (SOF, ¶ 48). When detainees need to relieve themselves, they are given a bedpan. (SOF, ¶ 49). However, the Policy also contains an exception providing that detainees are allowed to use the hospital washroom facilities "when medically permitted" and that their leg shackles should be removed to permit them to do so. (SOF, ¶ 50-51). If a detainee is medically permitted to use a washroom, he or she must be escorted and constantly monitored by an officer. (SOF, ¶ 50). The Policy ensures that detainees' handcuffs do interfere with their ability to eat or feed themselves. (SOF, ¶52).

### *The Sheriff's Official Policy Does Not Violate the Fourteenth Amendment*

As a pre-trial detainee, Plaintiff's rights were protected by the Due Process Clause of the Fourteenth Amendment. *See Guzman v. Sheahan*, 495 F.3d 852, 856 (7th Cir. 2007). Under that clause, a pre-trial detainee may not be punished prior to an adjudication of guilt. *Bell v. Wolfish*, 441 U.S. 520, 535 (1979). As such, the confinement of pre-trial detainees may not be punitive in nature. *Id.* This includes the use of bodily restraints without a legitimate purpose. *Murphy v. Walker*, 51 F.3d 714, 718 (7th Cir. 1995). Thus, such restraints may not be used in a manner that serves to punish. *May v. Sheahan*, 226 F.3d 876, 884 (7th Cir. 2000). Courts have found that the use of restraints on pre-trial detainees "constitutes punishment in the constitutional sense" if (1) their use is "not rationally related to a legitimate non-punitive government purpose" or (2) they appear "excessive in relation to the purpose they allegedly serve." *Id.*, citing *Bell*, 441 U.S. at 561. Here, the Sheriff's Policy is not "punishment" under either alternative.

I. **The Sheriff's Official Policy is Rationally Related to the Legitimate, Non-punitive Purpose of Maintaining Security While Detainees are at Hospitals Outside the Jail.**

"[M]aintaining institutional security" within a correctional facility is an "essential goal[] that may require the limitation or retraction of the retained constitutional rights of both convicted prisoners and pretrial detainees" and is "[c]entral to all other corrections goals[.]" *Bell*, 441 U.S. at 546 (internal quotations omitted). Courts have placed even more importance on maintaining security when detainees are transported outside of a correctional facility, such as to a hospital, and have acknowledged the rationality of using additional security precautions under those circumstances. In *Knox v. McGinnis*, 998 F.2d 1405 (7th Cir. 1993), the Seventh Circuit found that a prison's use of a handcuff cover (to prevent inmates from picking locks) when inmates were transported outside the prison did not violate the Constitution, even where the plaintiff maintained that the device caused him severe discomfort and physical injury. *Id*. at 1407, 1410-12 (discussing court decisions sanctioning use of restraints on special status prisoners outside prison). Likewise, in *May v. Sheahan*, a case closely paralleling the instant matter, the Seventh Circuit noted that "shackling all hospital detainees reduces the risk of a breach of security and thus furthers a legitimate non-punitive government purpose." 226 F.3d at 884.

Here, the express purpose of the Sheriff's Policy is to provide for the safety of hospital personnel and civilians, as well as the detainees themselves, when detainees are taken from the Jail to off-site hospitals and medical facilities. (SOF, ¶ 41). In furtherance of that purpose, the Policy states that all detainees who are transported or housed outside of the Jail are considered "high risk" detainees. (*Id.*). In the same year as the events at issue, 2009, more than 3,500 Jail detainees were scheduled to be transported by the Sheriff's External Operations Unit ("ExOps") for medical treatment at offsite hospitals and clinics. (SOF, ¶ 53). However, less than thirty ExOps officers were assigned to provide security at the three hospitals and approximately thirty

medical clinics where Jail detainees receive treatment. (*Id.*). Over the past fifteen years, more than fifteen escapes or escape attempts have been made by Jail detainees while they were being transported to or treated at these outside medical facilities. (SOF, ¶ 55). Detainees have made escape attempts when they did not appear physically able to do so, including while nine-months pregnant and in labor, after being stabbed six to eight times, while handcuffed to crutches allegedly needed to walk, while restrained in double-locked handcuffs, while handcuffed and shackled to a hospital bed, while handcuffed and shackled in a CCDOC van, and while allegedly unable to walk and confine to a wheelchair with a case on one leg. (SOF, ¶ 56).

Detainees have also escaped or attempted to escape from offsite medical facilities after officers removed their restrains in accordance with a physician's orders, as well as after the detainees were allowed to go to the bathroom unrestrained by handcuffs and/or shackles. (SOF, ¶57). One such detainee, who was unshackled to use the bathroom, pushed a guard to the ground and attempted to escape; a second detainee was unshackled from his bed so he could go to the bathroom, swung at officers, and was later found with possible weapons; and a third detainee stabbed an officer, medical staff, and civilians after his handcuffs were removed so he could go to the bathroom. (SOF, ¶¶ 57-59). Another detainee, recovering from stomach surgery at a hospital, fell to her death from a fourth-floor window while attempting to escape. (SOF, ¶ 59).

Here, on January 13, 2009, Sheriff's personnel transported Plaintiff from the Jail to Stroger Hospital, where he remained until January 17, 2009. (SOF, ¶¶ 15, 19). Stroger Hospital is an unsecure, 1.2-million-square foot facility (equivalent to twenty-five football fields) that treats hundreds of thousands of patients annually, has an emergency room that treats 110,000 patients each year, and has a staff of 300 attending physicians and more than 400 medical residents and fellows. (SOF, ¶ 54). Likewise, Stroger Hospital has been recognized in this district as a busy,

8

expansive, unsecure facility where detainee escape attempts are known to occur. *See, e.g., Zaborowski v. Dart*, 2011 U.S. Dist. LEXIS 14600, *14 (N.D. Ill. 2011) (St. Eve, J.). As discussed above, escape attempts by Jail detainees from facilities like Stroger Hospital are a serious security concern; threaten the safety and lives of medical staff, civilians, officers, and detainees themselves; and have resulted in grievous bodily injuries and even death. (*See* SOF, ¶ 53-59). Thus, the Sheriff's Policy requiring detainees who are taken to hospitals or medical facilities outside the Jail complex to be restrained with handcuffs and leg shackles, including the policies requiring restrained detainees to use bedpans and urine-collection devices instead of being released to use the bathroom, are based on legitimate security and safety concerns, as well as the limited number if ExOps officers available to provide security. (SOF, ¶¶ 60-61).

Thus, the Sheriff's Policy regarding handcuffing, shackling, or otherwise restraining detainees while they are outside the Jail in off-site hospitals is rationally related to the legitimate, non-punitive purpose of reducing the known risk of dangerous security breaches and protecting public safety. *See May*, 226 F.3d at 884; *Knox*, 998 F.2d at 1410-12; *Bell*, 441 U.S. at 561. Thus, the only remaining question is whether the Policy is "excessive" in achieving that purpose.

II. **The Sheriff's Official Policy is Not Excessive in Relation to Its Legitimate Purpose of Maintaining Security While Detainees are at Outside Medical Facilities.**

Plaintiff claims that, because of the Sheriff's Policy, he was subjected to "inhumane treatment, prolonged and unnecessary pain, and punishment" in violation of his constitutional rights. (Exhibit A, ¶ 12). However, nothing in the Record supports a conclusion that Plaintiff, as a result of the Policy, was subjected to unconstitutional treatment or punishment. Although "a detention facility has an interest in protecting the safety of inmates and guards and preventing escapes", prisoners have "an interest in being free from gratuitously severe restraints and hazards[.]" *Hart v. Sheahan*, 396 F.3d 887, 892-3 (7th Cir. 2005). Thus, an otherwise legitimate

9

policy for restraining detainees may still inflict punishment in violation of the Constitution if it is plainly excessive in carrying out its non-punitive purpose. *May*, 226 F. 3d at 884.

In *Bell*, for example, the Supreme Court posited that "[l]oading a detainee with chains and shackles and throwing him in a dungeon may ensure his presence at trial and preserve the security of the institution." 441 U.S. at 539 n. 20. "But[,]" the Court continued, "it would be difficult to conceive of a situation where conditions so harsh, employed to achieve objectives that could be accomplished in so many alternative and less harsh methods, would not support a conclusion that the purpose for which they were imposed was to punish[.]" *Id*. Likewise, in *May*, the court affirmed the denial of a motion to dismiss a detainee's claim that the sheriff's policy of shackling all hospital detainees violated Due Process, noting that that the plaintiff was "an AIDS patient" and that it was "hard to see how" shackling him around the clock was an appropriate policy for carrying out the legitimate purpose of maintaining security. *May*, 226 F.3d at 884. Such a policy is "plainly excessive in the absence of any indication that the detainee pose[d] some sort of security risk." *Id*. However, in affirming the denial of the motion to dismiss, the court continued, "Perhaps after some discovery [the sheriff] c[ould] produce evidence justifying both his shackling policy in general and his shackling of [the plaintiff] in particular[.]" *Id*.

Here, unlike in *May*, the Record is complete, and the Sheriff has produced ample evidence demonstrating that the Policy is not unnecessarily excessive and did not inflict gratuitous pain and suffering on Plaintiff, as well as evidence showing that Plaintiff himself posed a legitimate, individual security risk.

### *Although Restrained, Plaintiff Was Always Treated Humanely*

The Record shows that the manner in which Plaintiff was restrained was not inhumane or excessive. At the time, Plaintiff was ambulatory and capable of walking on his own. (SOF, ¶ 18).

Shackles were placed on Plaintiff's wrists and ankles during his transport to Stroger Hospital. (SOF, ¶ 16). Once there, despite his restraints, Plaintiff could stand upright unassisted. (SOF, ¶ 17). Once admitted, Plaintiff was restrained to his hospital bed with one leg shackled to one side of the bed and one arm to the opposite side of the bed, leaving his other hand and foot unrestrained. (SOF, ¶ 22). The restraints were attached so that Plaintiff could still feed himself as well as sit up on the bed. (SOF, ¶¶ 24-25). When he had to use the bathroom, Plaintiff was given a bedpan or a bottle with a funnel if he only needed to urinate (SOF, ¶ 26), and nothing in the Record indicates that Plaintiff was "medically permitted" to use a bathroom. Plaintiff also testified that he received medical care and treatment on a regular basis. (SOF, ¶ 21). Furthermore, he has no recollection of his doctors ever telling Sheriff's officers to remove his restraints. (SOF, ¶¶ 36, 39). On the contrary, Plaintiff testified that his restraints were removed at the request of his doctors on two occasions, and, although he does not specifically recall other instances, he concedes that his restraints were "probably" taken off for other examinations. (SOF, ¶¶ 27-29).

### *Plaintiff Does Not Dispute Being Shackled By His Arm*

Plaintiff's contention that the Sheriff's policy constitutes unconstitutional "punishment" is also undermined by his own testimony that he agrees with the shackling of his arm and did consider it to be punishment, and that the handcuffs on his wrist did not cause him any pain. (SOF, ¶ 34-35). Although he states that he experienced pain from his leg shackles being tight (SOF, ¶ 33), Plaintiff did not complain about his shackles to his nurses (SOF, ¶ 32), and he can only remember once complaining to an unknown female doctor on an unknown date about pain in his ankles (SOF, ¶ 30), which, he concedes, were swollen because of his kidney issues, not because of the shackles (SOF, ¶ 31). Plaintiff also did not require medical care for any injuries caused by his shackles which, when were removed, left "just" a "redness mark". (SOF, ¶ 37-38).

### *Plaintiff Could Walk, Had Been a Fugitive for Over 9 years, and Posed a Clear Flight Risk*

It is clear from the Record that Plaintiff was an obvious security risk. (*See* SOF, ¶¶ 10-14). In 1998 and 1999 respectively, Plaintiff was arrested on two felony drug charges, bonded out, and subsequently skipped bond and remained a fugitive for approximately nine years. (SOF, ¶¶ 10-13). Plaintiff eventually surrendered in 2009. (SOF, ¶ 14). Thus, there is no question here, as there was in *May*, whether, due to his medical condition, Plaintiff posed a significant enough security risk to justify the degree to which he was restrained. *See May*, 226 F.3d at 884. Plaintiff was clearly physically capable of walking. (SOF, ¶ 18). Nothing in the record shows that, if left unrestrained, Plaintiff was physically incapable of walking out of the hospital. Even if there was such an indication, it was still possible that Plaintiff could have attempted to escape, anyway, just as other have in the past, despite appearing physically incapable of doing so. (*See* SOF, ¶ 56). Being plainly physically capable of escaping, and having admittedly been a wanted fugitive for the better part of a decade, Plaintiff was clearly a legitimate security risk who individually warranted constant restraint. Thus, the facts demonstrate that the Sheriff's Policy is not unnecessarily excessive in achieving its legitimate security goals. Likewise, the Record is equally clear that Plaintiff was not subjected to excessive or gratuitously harsh treatment that might raise a genuine question of fact as to whether he had been "punished" in violation of his constitutional rights. Thus, Defendants are entitled to summary judgment in their favor.

III. **Even If Plaintiff Were Basing His Claim on an Alleged Wide-Spread Unconstitutional Practice, the Record Contains No Support for Such a Claim, and Defendants Would Still Be Entitled to Summary Judgment.**

Although Plaintiff's Complaint only challenges the Sheriff's official, express policy (*see* page 3, *supra*), even if he were basing a *Monell* claim on an alleged widespread custom or practice, his claim would still fail. Given the Record, Plaintiff cannot show that his constitutional

12

rights were injured by a widespread Sheriff's practice of excessively restraining hospitalized detainees. To impute knowledge to policymakers of a widespread practice, a plaintiff must show a pattern of violations; an isolated act will not suffice. *Palmer v. Marion Co..*, 327 F.3d 588, 596 (7th Cir. 2003). Moreover, "the word 'widespread' must be taken seriously." *Grieveson v. Anderson*, 538 F.3d 763, 774 (7th Cir. 2008). Here, nothing in the Record indicates a widespread pattern of violations. Rather, Plaintiff presents his own, limited experience as a detainee who was restrained pursuant to the Sheriff's Policy while hospitalized. Nothing about his experience under the Policy violated the Constitution, and there is no evidence of other detainees undergoing irrationally excessive restraint under the Sheriff's Policy or some other widespread custom or practice. Thus, Plaintiff's *Monell* claim would also fail under a "widespread practice" theory.

### IV. The Sheriff's Policy Did Not Result in Deliberate Indifference to Plaintiff's Serious Medical Need.

In order to prevail on a deliberate indifference claim, Plaintiff must show that he suffered from "an objectively serious medical condition" and that the Sheriff "knew of and disregarded his needs." *Warman v. Funk,* 119 Fed. Appx. 780 (7th Cir. 2004). Plaintiff must also show that the alleged indifference actually caused injury or harm. See *Ortiz v. City of Chicago*, 656 F.3d 523, 530, 534 (7th Cir. 2011); *Gayton v. McCoy*, 593 F.3d 610, 620 (7th Cir. 2010). Plaintiff may also meet this burden through an official capacity claim if the facts demonstrate that he suffered the alleged injury as a result of the "execution of a government's policy or custom." *Monell v. New York City Dept. of Social Services*, 436 U.S. 658, 694 (1978).

Here, Plaintiff cannot show that, as a result of the Sheriff's Policy, anyone knew of and disregarded his medical needs. The Sheriff's policy plainly requires that shackling not interfere with medical treatment and that detainees' restraints be removed when medically necessary, during emergencies, or when a physician orders that they be removed. (SOF, ¶¶ 46, 48, 51).

13

According to Plaintiff, he received medical care on a regular basis during the time at issue. (SOF, ¶ 21). Moreover, at the request of his doctors, Plaintiff's restraints were removed for at least two procedures and were probably removed for other examinations. (SOF, ¶¶ 27, 29). Also, Plaintiff testified that he complained about his shackles to one unknown doctor on an unknown date, but, unless he was having a medical procedure done, the shackles were not removed. (SOF, ¶ 30). Significantly, Plaintiff testified that he has no recollection of a doctor ever ordering that his shackles be removed for a medical reason. (SOF, ¶ 36). Since Plaintiff's testimony shows that no one knew of and disregarded his medical needs due to the Sheriff's Policy, Plaintiff cannot succeed on his deliberate indifference claim, and the Sheriff is entitled to summary judgment.

V. **The Sheriff's Policy Requiring Plaintiff to Use a Bed Pan and Urine-Collection Device Did Not Violate His Fourth Amendment Right to "Dignity".**

To the extent Plaintiff claims that using a bedpan and urine-collection device while remaining shackled violated his Fourth Amendment right to dignity, that claim must fail, too. Pretrial detainees retain their constitutional rights, including their Fourth Amendment rights against unreasonable searches and seizures. *Bell*, 441 U.S. at 545. However, those rights are limited by the realities of confinement, most importantly the need to maintain security and order. *Bell*, 441 U.S. at 545-6. Plainly, such rights would be limited also by the realities of maintaining security and order outside of jails in unsecure facilities like hospitals and clinics. Courts must balance the need for the particular search against the invasion of personal rights that it entails and "must consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted." *Id.* at 559.

Having to use a bedpan rather than being allowed to use a bathroom is not, on its face, a "search and seizure", reasonable or otherwise. However, assuming *arguendo* that it could be construed as such, a balancing of the invasion into Plaintiff's personal rights caused by having to

14

relieve himself in a bedpan against the Sheriff's need to maintain security in an inherently unsecure, massive, public, busy place like an off-site medical facility, such as Stroger Hospital where escapes are known to occur, clearly tips the scales in favor of security. *See Zaborowski v. Dart*, 2011 U.S. Dist. LEXIS at *14. Moreover, as discussed above, escape attempts from outside medical facilities have occurred in the past and resulted in serious injuries and even death. (SOF, ¶ 55-59). Such escape attempts also occur when detainees ask for their restraints to be removed so they can use the bathroom and even when detainees appear physically incapable of fleeing. (SOF, ¶¶ 56, 57, 59). Likewise, the manner in which Plaintiff is "searched and seized" by having to use a bedpan and urine-collection device is hardly an intrusion beyond the scope of the security need it is related to. The Sheriff's policies did not leave Plaintiff to wallow in his own excrement. Rather, he used a hospital bedpan and urine bottle, just like probably hundreds of other patients in the hospital at the time who were neither detainees nor known absconders from justice. Thus, any claim Plaintiff may state for a violation of his right to dignity must fail.

## CONCLUSION

WHEREFORE, the Defendants, Cook County Sheriff Thomas Dart and the County of Cook, for the foregoing reasons and the reasons set forth in their accompanying motion, respectfully request that this Honorable Court grant their Motion for Summary Judgment.

> Respectfully submitted,
> ANITA ALVAREZ
> State's Attorney of Cook County
> By: /s/R. Seth Shippee
> R. Seth Shippee
> 50 West Washington, Suite 500
> Chicago, Illinois 60602
> (312) 603-6299

This memorandum was prepared with the assistance and contribution of Emily J. Schlecte, law student, John Marshall College of Law.